IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DOMINIC JOSEPH, M.D.,               §
                                    §
            Plaintiff,              §
                                    §
v.                                  §        CIVIL ACTION NO. H-03-5402
                                    §
THE UNIVERSITY OF TEXAS             §
MEDICAL BRANCH OF GALVESTON         §
and WILLIAM READING, M.D.,          §
                                    §
            Defendants.             §


<u>MEMORANDUM AND ORDER</u>


     Pending is Defendants The University of Texas Medical Branch
at Galveston's and William Reading, M.D.'s Motion for Summary
Judgment (Document No. 44) and Objections to and Motion to Strike
Plaintiff's Summary Judgment Evidence (Document No. 51).[1]  After
carefully considering the motions, responses, replies, surreply and
the applicable law, the Court concludes as follows:


I.   <u>Background</u>


     Plaintiff Dominic Joseph, M.D. ("Plaintiff") brings this
action against Defendants The University of Texas Medical Branch at
Galveston ("UTMB") and William Reading, M.D. ("Reading"), both in
his official and individual capacities.  Plaintiff alleges that

---

     [1] Also pending is Plaintiff Dominic Joseph, M.D.'s Motion for
Oral Argument on Defendants' Motion for Summary Judgment (Document
No. 52), which is DENIED because the very thorough written briefs
submitted by the parties obviate any need for further argument.

UTMB violated Title VII of the Civil Rights Act of 1964 ("Title VII") by discriminating against him on the basis of race and/or national origin and by retaliating against him for opposing such conduct, and that Reading violated 42 U.S.C. § 1983 by depriving him of rights conferred by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

UTMB, a component institution of the University of Texas System, contracts with the Texas Department of Criminal Justice to provide health care services to the State of Texas's prison population.   In January 1994, Plaintiff was hired by UTMB's Correctional Managed Care division to work as a full time staff psychiatrist at the Jester IV Psychiatric Inpatient Unit ("Jester IV").   Beginning in July 2001, Plaintiff was assigned to work in the Crisis Management unit, where inmates with symptoms of psychiatric disorders are taken for evaluation and, if appropriate, treatment.[2]   As the psychiatrist for the Crisis Management team, Plaintiff was responsible for assessing inmates within three days of their arrival at Jester IV to determine whether they should be

---

[2] Crisis Management is the staging unit where preliminary assessments are made as to whether an inmate has a psychiatric illness that requires inpatient treatment.   If the Crisis Management team determines that the inmate may need inpatient treatment, the inmate is transferred to the Diagnostic and Evaluation Unit ("D&E"), where the patient is evaluated for up to seven days.   At the end of the inmate's stay in D&E, the inmate is either admitted for inpatient care and transferred to the applicable "pod," or returned to prison.

returned to their units of origin or should remain at Jester IV for thorough evaluation and, if appropriate, admission.

In August 2001, Reading was appointed Clinical Director of Jester IV and, in that capacity, became Plaintiff's immediate supervisor. Shortly after arriving at Jester IV, Reading states, he conducted a review of the personnel files of the entire staff under his supervision, including Plaintiff, in preparation for upcoming quarterly performance evaluations. Document No. 44 ex. 2 ¶ 4. In reviewing Plaintiff's file, Reading noted that although Plaintiff's medical care appeared adequate, several disciplinary actions had been taken against him:

1. On October 15, 1998, and again on January 29, 1999, Plaintiff received formal verbal reprimands by then-Clinical Director Dr. Pradan A. Nathan ("Nathan") for failing to record his time in accordance with Jester IV policy. *See* Document No. 44 ex. 6 at 1861-62.

2. On May 12, 2000, Plaintiff received a formal verbal reprimand from the Facility Management Team for signing a petition challenging UTMB's timekeeping requirements. Id. at 1629. The reprimand referred Plaintiff to the HR Discipline and Dismissal Policy, which listed petitioning as a grounds for disciplinary action, informed Plaintiff of the proper method for presenting and resolving such complaints, and counseled Plaintiff that refusal to comply with the challenged timekeeping procedure is a terminable offense. Id.

3. On June 29, 2001, Plaintiff received a formal verbal reprimand from Dr. Susan Ducate ("Ducate"), UTMB's Director of Mental Health Services, for refusing to attend a meeting conducted by Dr. Shana Khawaja ("Khawaja"), a senior psychologist and the administrative supervisor for all mental health staff. Id. at 2009. The reprimand stated that Plaintiff refused to attend the meeting, refused Ducate's request that Plaintiff

apologize to Khawaja for failing to cooperate, became verbally abusive to both Ducate and Khawaja, and justified his behavior by arguing with Ducate about who was his supervisor, all in violation of UTMB's policies against insubordination to a supervisor, failure to cooperate with a co-worker, and disruptive conduct. Id.[3]

4.   On July 23, 2001, Plaintiff received a formal written reprimand from Ducate concerning the performance of his psychiatric duties at Jester IV. Id. at 638. Specifically, Ducate reported that she had received and verified information that Plaintiff was not completing needed paperwork in a timely fashion, was not admitting inmates into D&E in a timely fashion, and had failed to move out of his former office and thus delayed the move of another psychiatrist into that office. Id. at 638, 1993. Ducate warned Plaintiff that the letter was a second step disciplinary measure and that Plaintiff faced suspension without pay and possible termination if the conduct continued. Id. at 638.[4]

Document No. 44, exs. 2 ¶¶ 4-5; 6 at 1881-82. On September 18, 2001, Reading presented Plaintiff with his performance evaluation, including the summary Reading had prepared and a copy of Plaintiff's job description. Id. exs. 2 ¶ 5; 6 at 1871-82.

Thereafter, according to Reading, he "began experiencing problems with [Plaintiff] almost immediately." Id. ex. 2 ¶ 6. On October 31, 2001, Reading issued a written reprimand to Plaintiff,

---

[3] Plaintiff filed a grievance, claiming that Ducate's letter was "an attempt to humiliate [him] as a Board Certified Psychiatrist" and requesting that the letter be withdrawn immediately "with proper explanation." Document No. 44 ex. 6 at 358, 1967.

[4] Plaintiff grieved this disciplinary action as well, claiming that the letter was in retaliation for his previous grievance and that he was being "singled out and victimized and discriminated secondary to [his] racial origin." Document No. 44 ex. 6 at 636-37.

detailing several problems with Plaintiff's work performance.  <u>Id.</u>
exs. 2 ¶ 6; 6 at 1911-13.   Specifically, Reading criticized
Plaintiff for failing to perform record-keeping functions in
accordance with Jester IV directives and failing to attend the
Jester IV staff picnic without permission or explanation.  <u>Id.</u> ex.
6 at 1911-13.  Plaintiff responded to Reading's letter in writing,
complaining that Reading's criticisms were "incomprehensible and
irrational," were "generated as a retaliation to [Plaintiff's]
verbal request that [Reading] limit [his] weekly Physician's
meeting to a reasonable hour to an hour and a half instead of three
hours," and were "an attempt to undermine [Plaintiff's] profes-
sional credibility."  <u>Id.</u> ex. 6 at 952, 1360.  Plaintiff also filed
a grievance.  <u>Id.</u>

    On November 6, 2001, Reading issued another written reprimand
to Plaintiff for "dishonesty."  <u>Id.</u> at ex. 6 at 1947-48.  In the
warning, Reading explained that although the "vocal, defiant, and
obstreperous manner" in which Plaintiff expressed a desire for
shorter physicians' meetings "could be classified as insubor-
dination, disruptive conduct, and possibly impairment of a work
unit," Reading was reprimanding Plaintiff only for falsely stating
that he was speaking on behalf of the entire psychiatric team when
in fact he was not.  <u>Id.</u> ex. 2 ¶ 7; 6 at 1947-48.  Again, Plaintiff
responded to Reading's letter in writing, "categorically deny[ing]

all the allegations" therein, and filed a grievance.  <u>Id.</u> ex. 6 at 293, 1372.[5]

On November 9, 2001, Reading issued a third written reprimand to Plaintiff for failing to adhere to his job description, standards of medical practice, and Jester IV directives.  <u>Id.</u> ex. 6 at 1580-81.  Specifically, Reading found that Plaintiff had improperly discharged a patient who should have been admitted to D&E. <u>Id.</u>[6]  Plaintiff responded to the letter in writing, explaining his decision to discharge the inmate, requesting that Reading "refrain from threatening me with the loss of my job," stating that Reading's "repeated attempts of unfounded allegations and character assassinations lead me to believe that you are taking a discriminatory attitude by continuing to harass me," and warning that "if you fail to refrain from similar activities, I will be compelled to take suitable legal action."  <u>Id.</u> at 306.  In addition, Plaintiff filed another grievance challenging the disciplinary action.  <u>Id.</u> at 307.

-----

[5] According to Plaintiff, he did not falsely hold himself out as representative of all psychiatrists.  Document No. 55 ex. B ¶ 6. Rather, he "merely asked Reading to shorten the amount of time he kept the psychiatrists in [their] weekly meetings from three hours to one and a-half hours," and "[w]hen asked, [Plaintiff] said 'yes,' that other psychiatrists shared his concern."  <u>Id.</u>

[6] According to Plaintiff, the inmate was not admitted to D&E because the Crisis Management team determined that he was stabilized and did not need detoxification.  Document No. 55 ex. B ¶ 6.

On November 28, 2001, Reading sent Plaintiff a memo informing him that during the month of October 2001, five patients were in Crisis Management for more than three working days despite the fact that Reading had granted no extensions, as Jester IV procedures require.  Id. at 1473.  Reading reminded Plaintiff that authorization was required for such extensions and that if more diagnostic testing was needed, the proper procedure was to admit the inmate to D&E.  Id.  Plaintiff then referred the matter to Woodrick, Pod Coordinator of Crisis Management/D&E at Jester IV, who requested further information about the incidents, which Reading provided.  Id. at 1474-75.

In early December 2001, Reading received two letters from Dr. John Raasoch ("Raasoch"), Clinical Director of the Skyview unit, another psychiatric unit of the Texas Department of Criminal Justice.  Id. exs. 2 ¶ 14; 6 at 1540, 1553.  Raasoch reported that on two separate occasions, inmates who had been admitted to D&E at Jester IV under Plaintiff's care were not treated before being transferred from Jester IV to Skyview.  Id.  Raasoch stated that the lack of treatment "represent[ed] a severe deficiency" and could have resulted in the death of one of the inmates, and Raasoch further expressed his belief that Plaintiff "should be held accountable for both of these cases."  Id. exs. 2 ¶ 14; 6 at 1540, 1553.

7

Meanwhile, Plaintiff presented an appeal of Reading's disciplinary actions to the Facility Management Team ("FMT").  In his complaint, Plaintiff denied the allegations made by Reading in the written reprimands and alleged that taken together, Reading's criticisms "show[ed] a discriminatory attitude by [Reading] and a pattern of harassment."  Id. ex. 6 at 1188.  Four members of the FMT--doctors Dostal, Victoria, Khawaja, and Reading--reviewed the appeal and, on December 19, 2001, announced their resolution.  Id. at 1188-90.  The FMT upheld the October 31 reprimand, reduced the November 6 reprimand to a formal verbal warning, and retracted the November 9 reprimand upon finding that due to a conflict in policies, Plaintiff "may not have clearly understood Dr. Reading's instructions."  Id. at 1190.  The FMT further stated that "[t]here should never be any type of retaliation or harassment by a supervisor towards his/her subordinate," and that "if you feel this is happening, you may address it with Dr. Reading's supervisor and/or the Regional Human Resources office."  Id.  Finally, the FMT stated that "[y]our relationship with Dr. Reading is something only the two of you can mend.  You and he must maintain a professional working relationship, even if differences of opinion remain."  Id.[7]

_____

[7] On January 20, 2002, Plaintiff, apparently dissatisfied with the FMT's resolution, filed a third level grievance appeal, in which Plaintiff stated that his "earlier request to let [him] work free of harassment has not been given any attention"; that Woodrick had informed him that Reading had told him to request that Plaintiff resign in lieu of termination; and that "[i]n view of [this] development [Plaintiff] request[ed] that [his] previous

8

Shortly thereafter, Reading undertook a review of Plaintiff's patient charts.  Id. ex. 2 ¶¶ 14-15.  Reading explains that he decided to audit Plaintiff's charts based on Raasoch's letters and Ducate's instruction that he investigate Raasoch's allegations. Id. ¶ 14.  Upon completing the review, Reading found Plaintiff's patient care to be "woefully inadequate."  Id. ¶ 15.  Thus, on January 22, 2002, Reading notified Plaintiff by letter of his intent "to request [Plaintiff's] termination of employment with [UTMB] at the close of business on Wednesday, January 23, 2003" due to Plaintiff's "substandard patient care."  Id. ex. 6 at 869-883. In the 15-page letter, Reading presented the case histories of 37 Jester IV patients whom Reading believed had received substandard care from Plaintiff between July and December 2001.  Id.  Reading also informed Plaintiff that he had until 10:00a.m. the next day to address the allegations in the letter, either in writing or in person, and that if he did not, his termination would be effective as of 5:00p.m.  Id. at 883.

According to Reading, he reported the results of the chart audit to Ducate, who "ordered" Reading to terminate Plaintiff's employment and "told [Reading] that if [he] did not terminate [Plaintiff], she would initiate disciplinary action against [Reading]."  Id. ¶¶ 15-16.  Moreover, Reading alleges, he submitted

_____

grievance against work place harassment . . . please be pursued." Document No. 44 ex. 6 at 922.

9

his findings and Plaintiff's disciplinary record to Dr. Owen Murray ("Murray"), Medical Director for UTMB's Correctional Managed Care. <u>Id.</u> ex. 2 ¶ 17.  In his affidavit, Murray states that Ducate "came to [him] regarding a chart review of [Plaintiff]'s patients," "discussed the chart review with" him, and "recommended that [Plaintiff] be terminated." <u>Id.</u> ex. 3 ¶ 3.  Murray "agreed with [Ducate's] assessment, and that of Dr. Reading and decided that terminating [Plaintiff] would be in the best interests of the patients and UTMB." <u>Id.</u>[8]  Reading also submitted his findings and Plaintiff's disciplinary record to Dorita Reed ("Reed"), a Human Resources Representative for Correctional Managed Care. <u>Id.</u> ex. 2 ¶ 17.  After reviewing the documentation and discussing the issues with Reed, UTMB's Director of Human Resources for Correctional Managed Care John Pemberton ("Pemberton") also approved the termination decision. <u>Id.</u> ex. 4 ¶¶ 4-5.

Plaintiff responded to Reading's letter the day he received it. <u>Id.</u> ex. 6 at 1869-70.  Plaintiff stated that he treated all of his patients in accordance with Jester IV's standard medical

---

[8] Murray contacted the Texas State Board of Medical Examiners (the "Board") to inform it of UTMB's assessment of Plaintiff's medical care, and the Board initiated an investigation "to determine whether a violation of the Medical Practice Act ha[d] occurred."  Document No. 55 ex. B at 3555.  A year later, in February, 2003, the Board closed the investigation with a finding that the evidence did "not indicate a violation of the Texas Medical Practice Act," thanked UTMB for bringing the information to its attention, and stated that the "process of oversight, or checks and balances, which was precipitated by your information is good for all concerned."  Document No. 50 ex. B at 3498.

protocol; that if Reading's suggestion was that the standard protocol should be changed, Plaintiff "would be willing to participate in any professional discussion of [Reading's] ideas"; that if the proposed termination was truly about Plaintiff's medical judgment, an independent peer review committee should look at the issue; and that if Reading wished Plaintiff to address the specific patients Reading addressed in his memo, Plaintiff would need "more than a few hours notice" and "access to the Medical records." Id. The following day, however, Plaintiff received from Reading a second letter, which notified Plaintiff that his employment had been terminated due to substandard patient care, outlined the case histories of the 37 patients who had allegedly received substandard care, and informed Plaintiff that he had a right to appeal Readings's decision. Id. at 836-50. Plaintiff subsequently appealed his termination which, after conducting a hearing, UTMB upheld.

Defendants now move for summary judgment on all of Plaintiff's claims on the following grounds: (1) Plaintiff's Title VII claims are barred by the statute of limitations; (2) Plaintiff cannot establish a prima facie case of discrimination because he cannot show that he was replaced by someone outside his protected class or treated less favorably than similarly situated non-Indian/Asian employees; (3) even if Plaintiff makes a prima facie case of discrimination, he cannot raise a fact issue that UTMB's legitimate

11

reason for its decision to discharge him was pretextual;
(4) Plaintiff cannot establish a prima facie case of retaliation
because he cannot show that there is a causal connection between
his informal complaints and his termination; (5) even if Plaintiff
makes a prima facie case of retaliation, he cannot raise a fact
issue that he would not have been terminated but for the filing of
his grievance; and (6) Reading is entitled to qualified immunity on
Plaintiff's equal protection claim.

## II.   Summary Judgment Standard of Review

Rule 56(c) provides that summary judgment "shall be rendered
forthwith if the pleadings, depositions, answers to inter-
rogatories, and admissions on file, together with the affidavits,
if any, show that there is no genuine issue as to any material fact
and that the moving party is entitled to a judgment as a matter of
law." FED. R. CIV. P. 56(c). The moving party must "demonstrate
the absence of a genuine issue of material fact." Celotex Corp. v.
Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the
nonmovant to show that summary judgment should not be granted.
Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th
Cir. 1998). A party opposing a properly supported motion for
summary judgment may not rest upon mere allegations or denials in
a pleading, and unsubstantiated assertions that a fact issue exists

will not suffice.  Id.  "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."  Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden."  Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986).  All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).  "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper.  Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993) (citing Matsushita, 106 S. Ct. at 1351).  On the other hand, if "the fact-finder could reasonably find in [the nonmovant's] favor, then summary judgment is improper."  Id.  Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial."  Anderson, 106 S. Ct. at 2513.

### III.  Discussion

A.  Motion to Strike

As an initial matter, Defendants object to and move to strike certain of Plaintiff's summary judgment evidence.  *See* Document No. 51.

13

1.   The hearsay objection to Exhibit C is SUSTAINED.   *See* FED. R. EVID. 801(d)(2)(D); *see also* <u>Young v. James Green Mgmt., Inc.</u>, 337 F.3d 616, 622 n.2 (7th Cir. 2003) (requiring, in the context of employment discrimination cases, that "the declarant must be involved in the decisionmaking process affecting the employment action involved" in order for his or her statements to qualify as having been made within the scope of employment).

2.   The objections to Exhibit A are ruled upon as follows:

a.   Objections B-1, B-2, B-4, B-5, B-6, B-7, B-8, B-9, B-12, B-13, B-14, B-15, B-16, and B-18 are SUSTAINED.

b.   Objection B-3 is SUSTAINED with respect to the third sentence of ¶ 15; it is otherwise OVERRULED.

c.   Objection B-10 is SUSTAINED with respect to the phrase "or care about"; it is otherwise OVERRULED.

d.   Objection B-11 is SUSTAINED with respect to the first sentence of ¶ 24 and with respect to the phrase "because her dereliction of duty could cause serious liability issues for them" in the last sentence of ¶ 24; it is otherwise OVERRULED.

e.   Objection B-17 is SUSTAINED as to ¶ 34, except as to the first and last sentences, as to which the objection is OVERRULED.

3.   The objections to Exhibits A-6 and A-7 are SUSTAINED.

14

4.    The objections to Exhibit B are OVERRULED.  *See* Document Nos. 55 ex. B; 57 ex. 1.

Defendants' Motion to Strike is therefore GRANTED IN PART, as set forth above.

B.    Plaintiff's Title VII Claims

1.    Statute of Limitations

UTMB first argues that Plaintiff's Title VII claims are time barred because this action was filed more than 90 days after the date the EEOC issued a right-to-sue letter. The undisputed summary judgment evidence is that the EEOC right-to-sue letter is dated August 25, 2003 and that Plaintiff filed this lawsuit 92 days later, on November 25, 2003.  It is also undisputed that Plaintiff does not know when he actually received the right-to-sue letter. "When the date on which a right-to-sue letter was actually received is either unknown or disputed, courts have presumed various receipt dates ranging from three to seven days after the letter was mailed." Taylor v. Books A Million, Inc., 296 F.3d 376, 379 (5th Cir. 2002).  Because Plaintiff cannot recall the specific date on which he received the right-to-sue letter, "a presumption of receipt is appropriate." Id. at 380.  Applying even the minimum number of days that courts have allowed under the presumption of receipt doctrine, i.e. three days after the EEOC mailed the letter,

Plaintiff's claim would be considered timely.  Thus, UTMB is not
entitled to summary judgment on this ground.

2.  <u>Discrimination</u>

Plaintiff contends that he suffered race and/or national
origin discrimination when UTMB terminated his employment.  Title
VII proscribes an employer from discharging or otherwise discrimi-
nating against any individual because of that individual's race or
national origin.  42 U.S.C. § 2000e-2(a)(1).  The Title VII inquiry
is "whether the defendant intentionally discriminated against the
plaintiff."  <u>Roberson v. Alltel Info. Servs.</u>, 373 F.3d 647, 651
(5th Cir. 2004).  Intentional discrimination can be established
through either direct or circumstantial evidence.  <u>Wallace v.
Methodist Hosp. Sys.</u>, 271 F.3d 212, 219 (5th Cir. 2001). Because
Plaintiff presents no direct evidence of discrimination, his claims
are subject to the burden-shifting framework set forth in <u>McDonnell
Douglas Corp. v. Green</u>, 93 S. Ct. 1817 (1973).  <u>Davis v. Dallas
Area Rapid Transit</u>, 383 F.3d 309, 316 (5th Cir. 2004).  Under this
framework, the plaintiff must first create a presumption of
intentional discrimination by presenting evidence of a prima facie
case.  <u>Id.</u> at 317.  To establish a prima facie case of discrimina-
tory discharge, Plaintiff must show that: (1) he is a member of a
protected class; (2) he was qualified for the position he held;
(3) he suffered an adverse employment action; and (4) he was

16

replaced by a person outside his protected class, or others similarly situated were treated more favorably. *See* Okoye v. Univ. of Tex. Houston Health Sciences Ctr., 245 F.3d 507, 512-13 (5th Cir. 2001). "To establish disparate treatment, a plaintiff must demonstrate that a 'similarly situated' employee under 'nearly identical' circumstances, was treated differently." Wheeler v. BL Dev. Corp., 415 F.3d 399, 406 (5th Cir. 2005) (citing Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1090 (5th Cir. 1995)).

The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the underlying employment action. Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2106 (2000). The burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.'" Id. (quoting St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2748 (1993)). If the employer sustains its burden, the inference of discrimination falls away, and the burden shifts back to the plaintiff to establish that the employer's proffered reason is merely a pretext for discrimination. *See* Davis, 383 F.3d at 317.

UTMB argues that Plaintiff cannot establish a prima facie case of discrimination because there is no evidence that he was replaced by a person outside his protected class, that a similarly situated non-Indian/Asian employee was treated more favorably under nearly identical circumstances, or that discriminatory bias otherwise

existed.[9]  First, it is undisputed that Plaintiff was replaced by
Dr. Hermet Patel, also of Indian/Asian ancestry.  *See* Document No.
44 exs. 2 ¶ 21; 4 ¶ 7.   In fact, the uncontroverted summary
judgment evidence is that it was Reading who recommended that Patel
be hired to replace Plaintiff.  <u>Id.</u>  Thus, Plaintiff cannot esta-
blish the fourth element with evidence that he was replaced by
someone outside his protected class.

Plaintiff contends, however, that the summary judgment record
contains evidence that "shows that Reading treated him differently
than all other psychiatrists at Jester IV." Document No. 49 at 15.
Specifically, Plaintiff argues that "[w]hile Reading even stated
that other psychiatrists were worse than [Plaintiff], he did not
take any action against them." <u>Id.</u>  In support of this contention,
Plaintiff cites a portion of psychologist Khawaja's testimony
during the February 2003 appeal hearing:

> Q:  Did Dr. Reading ever say anything critical of other
> psychiatrists there at Jester IV, particularly as
> compared to [Plaintiff]?
>
> A:  Yes, I can't exactly remember the time frame but
> there was a conversation that there were other physicians
> in the building doing the same thing as [Plaintiff] or he
> had said even worse than [Plaintiff] but actions weren't
> taken against those physicians.
>
> Q:  Did he name those physicians?
>
> A:  No, he did not.  He did not.

---

[9] For purposes of summary judgment only, UTMB does not dispute
that Plaintiff has met his initial burden on the first three
elements of the prima facie case.

<u>Id.</u> ex. E at 102; *see also* Document No. 50 ex. F at 68, 77, 86-87. Khawaja's testimony fails to create so much as a fact issue that employees with whom Plaintiff was similarly situated were not terminated, inasmuch as there is no evidence as to whom Reading was referring, let alone any evidence that those doctors were treated more favorably than Plaintiff under nearly identical circumstances. *See* <u>Wyvill V. United Cos. Life Ins., Co.</u>, 212 F.3d 296, 304 (5th Cir. 2000) (requiring "nearly identical circumstances" of employment to support a claim of disparate treatment).

Plaintiff next complains that others were treated more favorably because Reading did not fire Theveridge, a physician's assistant whom Plaintiff believes may have been involved in an incident of backdating psychiatric evaluations, and because Reading performed an extensive audit of only Plaintiff's patient charts. *See* Document Nos. 44 ex. 7 at 78-79, 254; 50 ex. F at 75-76, 248. Theveridge is a physician's assistant, not a psychiatrist, and Theveridge's alleged misconduct was backdating patient charts, not providing medical care viewed as substandard by UTMB. Morever, there is no evidence that Reading was Theveridge's supervisor or that Reading was aware of Theveridge's alleged backdating of patient charts. In other words, there is no evidence that Theveridge was similarly situated to Plaintiff but was not terminated under nearly identical circumstances. *See* <u>Wyvill</u>, 212

F.3d at 304-05; <u>Shackelford v. Deloitte & Touche, LLP</u>, 190 F.3d 398, 405-06 (5th Cir. 1999).

Likewise, there is no evidence that Reading failed to audit the patient charts of other similarly situated employees. The uncontroverted summary judgment evidence is that Reading audited Plaintiff's charts after receiving (1) serious complaints about Plaintiff's work performance from Raasoch, and (2) an instruction from his supervisor, Ducate, to investigate Raasoch's complaints. There is no evidence that Reading received from his supervisor instructions to investigate, yet failed to investigate, complaints about any other physician's medical practice. Thus, the fact that Reading audited Plaintiff's patient charts does not give rise to an inference that the resulting decision to terminate Plaintiff's employment was motivated by Plaintiff's Indian race/national origin.

Plaintiff also argues that Reading treated others more favorably because he (1) interviewed "a whole lot of staff" when performing his first quarterly evaluation of Plaintiff but, according to Plaintiff, "didn't go out of the way to interview" a lot of staff about doctors DeLeon, Milburn, Theveridge, Peccorra, and Nguyen, and (2) gave Plaintiff a warning for not attending an office picnic, but did not take disciplinary action against DeLeon or Woodrick, white psychologists who also did not attend. *See* Document Nos. 44 ex. 7 at 23-28, 33-34, 39-40; 49 ex. A ¶ 15; 50

ex. F at 235.   These incidents are not themselves actionable adverse employment actions, *see* Mattern v. Eastman Kodak Co., 104 F.3d 702, 708 (5th Cir. 1997), nor do they give rise to an inference that the relevant employment action--Plaintiff's termination--was motivated by Plaintiff's Indian race/national origin.   Plaintiff's termination was not based on the September 2001 performance evaluation or the October 2001 reprimand.   Thus, the fact that Reading may have performed a more thorough review of Plaintiff's work performance and reprimanded Plaintiff for not attending a picnic that others did not attend is not evidence that other employees were similarly situated to Plaintiff but were not terminated.   In sum, Plaintiff has failed to present any evidence that he suffered disparate treatment under nearly identical circumstances with regard to the only actionable employment decision--his termination.

Nonetheless, Plaintiff argues, there is "extensive circum-stantial evidence demonstrating Reading's discriminatory motive." Document No. 49 at 9.   In addition to the allegations discussed above, Plaintiff argues that the following "facts" lead him to believe that Reading harbored a discriminatory bias against him:

> 1.   In the first meeting he held as Clinical Director in August 2001, Reading was "very critical" of the two Indian psychiatrists who preceded him as Clinical Director, but he "didn't talk bad about" two non-Indians, Drs. Levya and Ducate, who had filled in as Clinical Director on occasion.   Document No. 50 ex. F at 19-23.

    2.    Plaintiff "thinks" Reading had a conflict with his secretary, who was Hispanic, and with Plaintiff's secretary, who was black.  <u>Id.</u> at 77; Document No. 44 ex. 7 at 92.

    3.    Reading gave Plaintiff three "ridiculous," "bogus" reprimands.  Document No. 44 ex. 7 at 32-34, 39.

    4.    Reading spread rumors that Plaintiff would be fired and repeatedly went to Woodrick looking for information that he could use against Plaintiff.  <u>Id.</u> at 77-78.

    5.    Reading rarely visited Plaintiff's office and "hardly spoke to [Plaintiff."  Document No. 50 ex. F at 74-75, 78.

Plaintiff contends that this evidence is circumstantial evidence of intentional discrimination sufficient to satisfy his initial burden.

    This evidence, however, when viewed in the light most favorable to Plaintiff, raises no fact issue to support Plaintiff's discrimination claim.  None of Reading's criticisms of his Indian predecessors, Drs. Patel and Nathan, is shown to have been attributable to their Indian race/national origin.  In fact, Plaintiff himself conceded during his deposition that Reading made no comments of a racial or ethnic nature about those doctors but rather criticized their management styles.  Document No. 44 ex. 7 at 18-23.  This evidence permits no inference that Reading harbored a bias against persons of Indian ethnicity.  With respect to Reading's alleged conflicts with his and Plaintiff's secretaries, there is no evidence as to the nature of those conflicts, let alone evidence from which a general bias against "people of color" could

reasonably be inferred.  The remainder of Plaintiff's evidence--his belief that the warnings Reading gave him were "ridiculous" and "bogus," his testimony that Reading rarely visited his office, and Woodrick's testimony that Reading spread rumors that Plaintiff would be fired and came to him looking for information that could be used against Plaintiff--does not give rise to an inference that Plaintiff's termination was an act of intentional discrimination on account of his race/national origin.  Although there is evidence to suggest that Reading and Plaintiff were both highly irritated and frustrated by each other's conduct in their professional relationship, and that they each apparently had a growing disdain and dislike for the other, there is no evidence, considered separately or cumulatively, that Reading's opinion of Plaintiff and assessments of his work performance were in any way influenced by Plaintiff's race/national origin.

Because Plaintiff was not replaced by a person outside his protected class, and because he cannot raise so much as a fact issue that similarly situated non-Indian employees were not terminated under nearly identical circumstances, or that his termination was otherwise discriminatory on account of his race/national origin, Plaintiff has failed to establish a prima facie case.

Even if Plaintiff had presented a prima facie case, however, he has failed to rebut Defendant's proffered legitimate, non-

discriminatory reason for its decision to terminate his employment, namely that Plaintiff provided medical care regarded as substandard by his employer. *See* <u>Perez v. Region 20 Educ. Serv. Ctr.</u>, 307 F.3d 318, 326 (5th Cir. 2002) (stating that poor work performance is a legitimate, non-discriminatory reason for discharge). Plaintiff argues that UTMB's stated reason for terminating him--substandard medical care--is pretextual because the Texas State Board of Medical Examiners absolved him of violating the Texas Medical Practice Act. *See* Document No. 50 ex. B at 3498. As UTMB correctly points out, however, the fact that the Board found no violation of the Texas Medical Practice Act is not evidence that Reading and the other UTMB physicians who reviewed Reading's termination recommendation did not perceive and find Plaintiff's work performance to be substandard at UTMB.[10] Moreover, it is the fact that UTMB *reported* its adverse findings about Plaintiff to the Texas State Board, which precipitated a Board investigation, that evidences the genuineness of UTMB's negative assessment of Plain- tiff's performance, regardless of what the Board ultimately found.

Along the same lines, Plaintiff argues at length that he did not violate UTMB's treatment guidelines and policies, that it was Reading who did not understand those policies, and that Reading's

---

[10] The summary judgment evidence also reflects that the Board subpoenaed only eight of the 37 patient charts with which Reading found problems and based its decision on those eight charts. *See* Document No. 50 ex. B at 3399.

assessment of Plaintiff's work performance was wholly inaccurate.[11] However, Plaintiff cannot survive summary judgment merely because he disputes or disagrees with Reading's characterization of his work performance; rather, the proper inquiry is "whether [UTMB]'s *perception* of [Plaintiff]'s performance, accurate or not, was the real reason for [his] termination." Shackelford, 190 F.3d at 408-09; *see also* Laxton v. Gap, Inc., 333 F.3d 572, 579 (5th Cir. 2003) ("[The inquiry] is not whether [the employer]'s proffered reason was an *incorrect* reason for [the] discharge."); Mayberry, 55 F.3d at 1091 ("[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason.  We do not try in court the validity of good faith beliefs as to an employee's competence.  Motive is the issue. . . . [A] dispute in the evidence concerning . . . job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence.") (quoting Little v. Republic Refining Co., 924 F.2d 93, 97 (5th Cir. 1991)).  Again, Plaintiff has provided no evidence that Reading and the other UTMB physicians who reviewed Reading's termination

---

[11] Specifically, Plaintiff in his declaration challenges in detail "the specific criticisms that Reading lodged against [Plaintiff] . . . as to the seven patients whose medical records were provided to defendants' expert witness, Pogos Voskanian, M.D." Document No. 55 ex. B ¶¶ 9-22; *see also* Document No. 44 ex. 5.

recommendation--namely Dr. Ducate and Dr. Murray--did not perceive Plaintiff's work performance to be substandard.[12]

In addition to challenging whether Reading properly determined that Plaintiff provided substandard care, Plaintiff argues that there is evidence that Reading intended to fire Plaintiff before he had any chance to assess Plaintiff's medical competence. Specifically, Plaintiff points to Woodrick's affidavit, in which he avers that Reading stated to him on more than one occasion that Reading "wanted to get [Plaintiff] out of there"; that he had intentionally increased Plaintiff's workload in an effort to "get [Plaintiff] to quit"; and that he "had deliberately been spreading rumors about [Plaintiff]'s impending termination in hopes that [Plaintiff] would quit."  Document No. 49 exs. A ¶¶ 20-21, 27; E at 130-31.  A dispute of fact may well be present on whether Reading disliked Plaintiff or disliked working with him.  "However, this dispute alone is insufficient to support an inference of racial [or national origin] discrimination where, as here, the remaining evidence is too speculative and too reliant on isolated incidents to survive summary judgment."  Shackelford, 190 F.3d at 405; cf. Reeves, 120 S. Ct. at 2108-09.

In sum, Plaintiff has failed to raise so much as a genuine issue of material fact that his employment with UTMB was concluded

---

[12] UTMB's Director of Human Resources at its Department of Correctional Managed Care, John Pemberton, also reviewed and approved the termination decision.

because of race/national origin discrimination.  UTMB is therefore entitled to summary judgment on Plaintiff's discrimination claim.

### 3.    Retaliation

Plaintiff also contends that UTMB terminated his employment in retaliation for his internal grievances.  Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]. . . ."  29 U.S.C. § 2000e-3(a).  "The ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment decision."  Long v. Eastfield College, 88 F.3d 300, 305 n.4 (5th Cir. 1996).  To establish a prima facie case of retaliation, Plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action.  See Davis, 383 F.3d at 319; Roberson, 373 F.3d at 655.

Although the summary judgment evidence is slim that Plaintiff was engaging in a statutorily protected activity that had a causal connection to his discharge, viewed in the light most favorable to Plaintiff, there is summary judgment evidence that Plaintiff complained on more than one occasion about receiving discriminatory

treatment from Reading, that Reading knew about Plaintiff's complaints, that Reading subsequently initiated an audit of Plaintiff's patient charts, that Reading was the driving force behind Plaintiff's termination, and that Reading may have disliked Plaintiff. This evidence, viewed in its totality and in the light most favorable to Plaintiff, is minimally sufficient to raise an issue of material fact on whether Plaintiff was terminated in retaliation for his complaints of discriminatory treatment by Reading. Summary judgment must therefore be denied on the retaliation claim.

C.    Plaintiff's § 1983 Claims: Qualified Immunity

Reading moves for summary judgment on Plaintiff's § 1983 claims, arguing that he is entitled to qualified immunity.[13] "Qualified immunity protects government officials who perform discretionary functions from liability 'unless their conduct

---

[13] Reading apparently seeks qualified immunity on both the individual and official capacity claims asserted against him. However, qualified immunity is a defense only to an individual capacity suit; in an official capacity suit, such a defense is unavailable. Kentucky v. Graham, 105 S. Ct. 3099, 3105 (1985). This is because official capacity suits are just another way of pleading an action against the entity of which the individual is an employee. Hafer v. Melo, 112 S. Ct. 358, 361 (1991) (citing Graham, 105 S. Ct. at 3105)). Thus, the only immunities that may be claimed in an official capacity action are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment. Id. Although sovereign immunity may well apply to bar Plaintiff's official capacity claim, neither Reading nor UTMB has moved for summary judgment on this ground.

violates clearly established statutory or constitutional rights of
which a reasonable person would have known.'" Glenn v. City of
Tyler, 242 F.3d 307, 312 (5th Cir. 2001) (quoting Harlow v.
Fitzgerald, 102 S. Ct. 2727, 2738 (1982)).  In determining whether
an official is entitled to qualified immunity, a court must first
"consider whether the facts alleged, taken in the light most
favorable to the party asserting the injury, show that the
[official]'s conduct violated a constitutional right." Price v.
Roark, 256 F.3d 364, 369 (5th Cir. 2001).  If the plaintiff's
allegations could make out a constitutional violation, the court
must determine whether the officials's conduct was objectively
reasonable in light of clearly established law at the time that the
challenged conduct occurred--that is, whether it would be clear to
a reasonable official that his conduct was unlawful in the
situation he confronted. Glenn, 242 F.3d at 312; Southard v. Tex.
Bd. of Criminal Justice, 114 F.3d 539, 550 (5th Cir. 1997).

     Applying this analysis to the allegations and summary judgment
evidence presented by the parties in this case, Plaintiff has
failed to show a violation of his rights under the Equal Protection
Clause.  "In order to state a claim of racial discrimination under
the Equal Protection Clause and § 1983, a plaintiff must
demonstrate that the governmental official was motivated by
intentional discrimination on the basis of race." Coleman v.
Houston Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997); *see*

29

*also* <u>Johnson v. Houston Indep. Sch. Dist.</u>, 930 F. Supp. 276, 288 (S.D. Tex. 1996) (stating that to establish a § 1983 claim for a violation of the Equal Protection Clause, the plaintiff must show that his employer treated him differently than other similarly situated employees); <u>Wallace v. Tex. Tech Univ.</u>, 80 F.3d 1042, 1047 (5th Cir. 1996) (explaining that race discrimination claims under § 1983 are analyzed under the same framework as claims of discrimination under Title VII).  Consequently, to assert a violation of a constitutional right, Plaintiff must prove that Reading intentionally discriminated against him on the basis of race/national origin.  <u>Coleman</u>, 113 F.3d at 533-34.  As discussed above with respect to Plaintiff's discriminatory discharge claim, Plaintiff has failed to raise so much as a genuine issue of material fact that Reading intentionally discriminated against him on account of his race/national origin.  Thus, Plaintiff has failed to create a fact issue that Reading violated his right under the Equal Protection Clause to be free from disparate treatment based on his race/national origin.  *See*, *e.g.*, <u>Jackson v. Katy Indep. Sch. Dist.</u>, 951 F. Supp. 1293, 1304-05 (S.D. Tex. 1996).  Reading is therefore entitled to qualified immunity as to Plaintiff's § 1983 claim against him in his individual capacity.

IV.   <u>Order</u>

For the reasons set forth, it is hereby

ORDERED that Defendants The University of Texas Medical Branch at Galveston's and William Reading, M.D.'s Motion for Summary Judgment (Document No. 44) is GRANTED IN PART.  Plaintiff's Title VII discrimination claim against UTMB and Plaintiff's § 1983 claim against Reading in his individual capacity are DISMISSED on the merits.  The motion is otherwise DENIED.  Remaining for trial are Plaintiff's Title VII retaliation claim against UTMB and Plaintiff's § 1983 claim against Reading in his official capacity.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas on this 30th day of December, 2005.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE


31